**SALMON RIVER CONCERNED CITIZENS, et al.; California Coalition for Alternatives To Pesticides; Safe Alternatives for our Forest Environment, Inc.; Northcoast Environmental Center, Inc., Plaintiffs–Appellants,**

v.

**Dale ROBERTSON, Chief Forester, United States Forest Service, et al.; Department of Agriculture, Defendants–Appellees.**

No. 92–16113.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1993.

Decided July 5, 1994.

**1348**

Michael Axline, Western Environmental Law Center, Eugene, OR and Matthew McKeowon, Student, for plaintiffs-appellants.

John A. Bryson, Edmund F. Brennan, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Gary G. Stevens, Saltman & Stevens, Washington, DC, for amicus curiae.

Before: TANG, TROTT, and FERNANDEZ, Circuit Judges.

TANG, Senior Circuit Judge:

Appellants (collectively, "SRCC")[1] challenge the vegetation management policy for the Pacific Southwest Region adopted by the Chief Forester for the United States Forest Service ("Forest Service" or "Service"). In particular, SRCC challenges the environmental impact statement underlying the policy and issued under the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. The district court granted summary judgment in favor of the Forest Service. SRCC appeals, arguing that the impact statement is inadequate under NEPA. The Forest Service counters that SRCC lacks standing to press its action, and that its claims lack merit. We find that SRCC has standing, but affirm the district court's summary judgment in favor of the Forest Service.

### BACKGROUND

SRCC filed this action against the Forest Service on February 21, 1991, challenging both the Service's Region 5 Vegetation Management for Reforestation Final Environmental Impact Statement ("FEIS" or "Impact Statement") and Record of Decision ("ROD") of February 27, 1989. Pursuant to these documents, district foresters are authorized to use herbicides on National Forest lands in Northern California and portions of Oregon and Nevada.

The Forest Service is obliged under the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1601 *et seq.*, to prepare and implement land and resource management plans for our National Forests, one objective being to produce a continuous supply of timber for logging.[2] The Service im-

---

1. Appellants are four entities: Salmon River Concerned Citizens, an unincorporated membership organization; California Coalition for Alternatives to Pesticides, Inc.; Safe Alternatives for Our Forest Environment, Inc.; and Northcoast Environmental Center, Inc. These organizations

are nonprofit and have both group and individual constituents.

2. Each plan must "provide for multiple use and sustained yield of the products and services obtained [from a national forest] in accordance

plements this objective through reforestation.[3] Because competition from other plants often prevents achieving timber yield objectives, the Forest Service intervenes to assist the growth of trees through vegetation management.[4]

The FEIS at issue in this case evaluates the use of herbicides as part of the vegetation management plan for the Pacific Southwest Region (Region 5). The lands claimed to be most likely affected are located in Northern California and the Sierra Nevada, totaling approximately six million of the total twenty million acres of National Forest System land in the Region.

The Impact Statement is the culmination of public and private efforts over the last twenty years. The previous environmental impact statement was published in 1974. As a result of increased public concerns about human health and safety, the environment, changes in applicable federal law, and the development of new information and technology, the process of updating that impact statement began in 1981. The process led to a revised impact statement that was published and released for public comment in mid–1983.

In 1984, while the revised impact statement was still under consideration, the Forest Service initiated a moratorium on herbicide use in Region 5. The impetus for this decision was two judicial decisions in which this Circuit precluded government agencies from relying solely on herbicide registration by the U.S. Environmental Protection Agency ("EPA") to verify herbicide safety for normal use. As a result, this Circuit required agencies to undertake a worst case analysis concerning the safety of herbicides. *See Save Our Ecosystems v. Clark,* 747 F.2d 1240 (9th Cir.1984); *Southern Oregon Citizens Against Toxic Sprays v. Clark,* 720 F.2d 1475 (9th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984).

In response to these two decisions and public comment, the Service supplemented the revised impact statement. With assistance from various consultants, the supplement was published and circulated for public comment in 1986. It included a worst case analysis of the risks from herbicide use to human health, soils, water quality, and wildlife.

The Forest Service published the FEIS now in issue in December 1988. The Impact Statement incorporates and responds to public comments to both the revised impact statement and the 1986 supplement. In doing so, the Impact Statement identifies and evaluates eight alternative vegetation management programs, each employing several methods of controlling vegetation, including mechanical, thermal, manual, chemical, and biological controls.[5] Each alternative em-

---

with the Multiple–Use Sustained–Yield Act of 1960 [16 U.S.C. §§ 528–531], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).

**3.** "Reforestation," as used in the FEIS here, "covers more than the traditional forestry definition—reestablishment of trees." FEIS at 1–1. Specifically, "reforestation" includes the "promotion of stand growth, which foresters call 'timber stand improvement.'" *Id.* This broader definition looks to the "establish[ment of] trees on harvested, burned, or brush-covered commercial forest lands capable of sustained yields of wood fiber," and the "[maintenance of] adequate numbers of trees growing at rates that will provide desired levels of multiple-use benefits." *Id.*

**4.** The variety of methods for controlling undesirable vegetation include digging up plants by hand or by mechanical equipment; controlled burning of the vegetation; biological techniques, such as livestock grazing; and the application of herbicides.

**5.** The following seven factors are identified to develop and evaluate the eight alternatives:

(1) How will the Forest Service minimize the adverse effects of vegetation management practices on human health and safety?

(2) How will the Forest Service determine how much control of competing vegetation is needed?

(3) How will the Forest Service use the biological and physical site characteristics in planning and conducting vegetation management projects?

(4) How will the Forest Service protect or enhance the physical and biological environment, such as wildlife habitat, water quality, visual resources, and soil productivity, when planning and coordinating vegetation management projects?

(5) How will the Forest Service consider the cultural and lifestyle needs of Native Americans and other social groups for hunting, fishing, food, material and fuel gathering, and religious practices when planning and conducting vegetation management projects?

phasizes a specific objective, such as, cost-effectiveness, maximizing timber production, maximizing employment opportunities, preservation of nontimber resources, or minimizing or prohibiting the use of herbicides.

More pertinent to the issues before us, the FEIS evaluates the effect of each of the eight alternatives on, *inter alia,* soil and water quality, air quality, vegetation, wildlife, fisheries, human health and safety, cultural resources, and scenic quality. The Impact Statement also evaluates the socioeconomic effects of each alternative, including an analysis of economic efficiency and the cost of alternative approaches.

The evaluation of the effects on human health and safety considers risks to forest workers and to the public from the use of thirteen herbicides. The Forest Service accomplished its analysis by applying a "risk assessment" methodology. This methodology compares doses of an herbicide that people may get from applying the herbicide, or from being near an application site, with doses that produced no observable adverse effects in test animals and were considered

(6) To what extent will the Forest Service consider effects on local and regional employment and community stability when planning and conducting vegetation management projects? (7) To what extent will the Forest Service consider cost effectiveness, including direct and indirect costs and benefits, when planning and conducting vegetation management projects? FEIS at 1–9–10.

6. The FEIS highlights three factors in particular. First, the safety levels, or NOELs (no-observed-effect levels), established in the laboratory are the result of tests on laboratory animals, where the dose levels of the chemical produce no visible effects. To allow for some uncertainty in extrapolating from a NOEL in laboratory animals, additional safety factors were applied. The generally accepted factors are, the FEIS notes, ten for extrapolating from an animal model to humans, and an additional factor of ten to account for possible variations within the human population.

A second area of uncertainty in judging the risks to humans occurs when doses that a person may receive once or perhaps a few times in a lifetime are compared to levels of the chemical that produced no ill effects in laboratory animals over a prolonged period of time.

Third, the assessment overestimated the human doses likely to occur in herbicide use.

7. Hazard Analysis is used to determine the toxic properties of each herbicide. Human hazard

safe in laboratory studies. Because various factors contributed to uncertainty in this process,[6] however, the Service employed several other analytical approaches to conduct a more comprehensive assessment of the risks to human health: hazard analysis, exposure analysis, and risk analysis.[7]

The resulting risk assessment addresses the potential for herbicides to cause general systemic effects, heritable mutations, synergistic effects, cumulative effects, and effects on sensitive individuals. Unfortunately, missing or unavailable information regarding exposures or certain ill effects produced gaps in the data. These gaps are "evaluated in terms of [their] importance in determining human health risks ... and in terms of the cost and delay required to supply the information." FEIS at 4–63. As a result, this aspect of the risk assessment includes an assessment of the effects of herbicide applications under three scenarios: a normal or realistic scenario, an abnormal or conservative scenario, and an accident or worst case scenario.[8]

levels are derived primarily from the results of laboratory experiments on animal models, such as rats, mice, and rabbits, supplemented where appropriate with information on human poisoning incidents, epidemiology studies, and data on chemical structure.

Exposure Analysis involves estimating single and multiple exposures to persons potentially exposed to the herbicides, determining the doses likely to result from those estimated exposures, and determining the number and characteristics of persons in the exposed populations.

Risk Analysis requires combining the hazard information with the dose estimates and the probability that they could occur to predict the health effects to individuals under the given conditions of exposure.

8. "To represent the range of doses under normal operating procedures, normal application scenarios representing aerial, truck, backpack, and hand application methods were used. The scenarios used normal herbicide application rates and typical treatment unit sizes to calculate a range of doses to workers. Doses to members of the public who may be in the area or who may live nearby were calculated for aerial, truck, and backpack scenarios.... Abnormal scenarios were used to account for risk conditions above those expected during normal operations. Abnormal scenarios include situations such as more than the scheduled number of applications to an area, use of the wrong herbicide, or treatment of

Based on these analyses, the FEIS recommends that the Forest Service adopt Alternative 1 as its vegetation management program, which seeks to "maximize flexibility for professional foresters to select the most appropriate treatments, based on site-specific conditions and other considerations, consistent with achieving land management objectives." *Id.* at 2–14. More specifically, this alternative "allows use of all methods to treat competing vegetation ... adequate ... to meet the timber yield objectives.... However, herbicides are to be used only when essential...." *Id.* at 2–14–17.

The Regional Forester adopted the Impact Statement's recommendation, delegating to district foresters, for the most part, the discretion to apply herbicides at the project level.[9] On June 1, 1989, SRCC appealed the ROD in an administrative proceeding, securing a partial stay precluding the use of herbicides during the pendency of the appeal. On January 1, 1991, the Forest Service affirmed the Regional Forester's decision to select Alternative 1 as modified in the ROD, approved the FEIS, and denied SRCC's request for a new impact statement. Furthermore, the Service lifted the moratorium on its use of herbicides in Region 5, and quashed the stay. The Forest Service found the Regional Forester's decision to be neither arbitrary nor capricious. The Service also found that the FEIS adequately disclosed and discussed the potential risks to human health from the use of herbicides. It noted, in particular, that many of the issues

and concerns raised by SRCC were site-specific concerns not within the scope of a programmatic document such as the FEIS.

SRCC then pursued its challenges of the FEIS and the ROD against the Forest Service in federal district court. Both parties moved for summary judgment, the Service contending that the complaint was insufficient in either establishing SRCC's standing, or merit requiring declaratory or injunctive relief. Although it rejected the defense that SRCC failed to establish its standing and that the case was not ripe, the district court granted the Forest Service's summary judgment, concluding that the Impact Statement, its risk assessment in particular, satisfied the requirements of NEPA. SRCC appeals that decision.

### *DISCUSSION*

#### I. *Standing*

##### A.

The district court's denial of summary judgment on the issue of standing is reviewed *de novo.* *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1513 (9th Cir. 1992).

##### B.

■ The Forest Service claims that SRCC lacks standing because it failed to demonstrate that it or its members will suffer con-

---

the wrong area. The probabilities of these occurrences were determined from Forest Service records of similar incidents. These scenarios result in higher worker and public exposures and could potentially affect different populations.... The probabilities of the accidents depicted in the scenarios actually happening range from unlikely to extremely unlikely. Wherever possible, historical records of accidents were used to indicate the probabilities of accident occurrence."

*Id.* at F–3–5.

9. The Regional Forester made, however, three modifications:

1. Use of herbicides containing inert ingredients listed by the U.S. Environmental Protection Agency (List # 1 or # 2) is prohibited, with one exception. Herbicides with fuel oil as the only listed inert ingredient can be used.

I am allowing this exception because the risk analysis in the FEIS shows that the potential risks of adverse environmental effects are acceptable. I recognize that there may be some additional risk associated with "full-formulations". However, the available data show that most of the risk is associated with the active ingredients, which is evaluated in the FEIS.

2. No herbicide will be used that is listed by the State of California in compliance with the Safe Drinking Water and Toxics Enforcement Act (Proposition 65), without first receiving a safe-use determination from the State Health and Welfare Agency.

3. The herbicide fosamine will not be used because human health risks could not be adequately evaluated in the FEIS. The available data for cancer and chronic toxicity are too limited.

ROD at 1–2.

crete injury.[10] Specifically, the Forest Service claims that affidavits of individual members of SRCC fail to demonstrate that the members would be harmed by a specific project using herbicides.[11]

SRCC focuses intently on the affidavits of Larry Glass and David M. Webb. Mr. Glass states that the members of SRCC enjoy a number of activities in Region 5, and asserts that these activities will be adversely affected by the vegetation management program recommended in the Impact Statement. He also states that many of the "members live adjacent to Region [5] national forests and on inholdings within those forests." Although much of his statement details the interests the appellant organizations have in the FEIS, he also addresses how the Impact Statement affects him personally:

> As a member of CCAP, SAFE, the South Fork Mountain Defense Committee, and the Northcoast Environmental Center, I have personally used and enjoyed many of the national forests in Region V. I routinely visit the Six Rivers national forest, and my home is within the boundaries of the Shasta Trinity national forest. I visit the Tahoe and Klamath national forests on a regular basis. I take my twelve year old son and four year old daughter on these visits. We hike and camp in various areas of the forests, and my son and I fish in the rivers and streams of these forests, and the entire family swims in the rivers. In addition, the family gathers herbs and flowers on these visits, from which we make various dyes, herbal remedies, and teas.

He then concludes that his ability and the ability of his family to use and enjoy the national forests in Region 5 are adversely affected by the Forest Service's action.

Mr. Webb states that he hikes in various forests of Region 5 weekly. He also emphasizes that he is hypersensitive to chemicals. In this regard he states:

> I moved to Mt. Shasta to ensure that the air I breathe and the water I drink and wash with is as uncontaminated as possible. If the Forest Service resumes the use of herbicides or pesticides, I believe the quality of the air and water will degrade to an unsafe level. If this does occur, I expect to experience a recurrence of many of my health problems as described in the [prior] affidavit. The result will be that I will once again find myself totally disabled from chemical exposure.

> Since moving to Mt. Shasta, I have done everything I could to improve my health. In many cases, the best that could be done was to identify those things that caused me problems and find ways to avoid them. I have reached that point that I am now able to work at my own business, and am self supporting. I have kept the Social Security Administration informed of my progress, and they have recently told me that I am no longer be [sic] eligible for disability payments because I am currently able to support myself.

> I take great pride in the fact that I have found a way to be productive again, but am also very worried because I know how tenuous my position is now. In order to reach this point, I have had to completely avoid certain chemicals, such as pesticides. I also have to carefully control what I eat, drink, and am exposed to by other people (shampoos, detergents, deodorants, petroleum products).

> Because the Region V FEIS authorizes any district ranger in any national forest in

10. SRCC seeks to represent the interests of its members. Such "representational standing" is appropriate where 1) the organization's members would have standing to sue on their own, 2) the interests the organization seeks to protect are germane to its purpose, and 3) neither the claim asserted nor the relief requested requires individual participation by its members. See *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986); *Hunt v. Washington State Apple Advertising Comm'n*, 432

U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The Forest Service contends, essentially, that SRCC's individual members would not have standing to pursue this suit on their own, so SRCC lacks standing to sue.

11. To survive a motion for summary judgment that challenges a claimant's standing, the claimant must demonstrate specific facts, through affidavit or other competent evidence, in support of his or her standing to bring the lawsuit. See Fed.R.Civ.P. 56(c).

Region V to use herbicides at any time, my physical well being as well as my ability to use and enjoy the national forests in Region V is adversely affected on all national forest lands throughout the Region.

He states in a prior affidavit that he lives ⅛ mile from a national forest in Region 5.[12]

The record evidences that SRCC members live adjacent to or within the boundaries of Region 5. Also, individual members state that they visit several of the national forests in Region 5 routinely. These members specifically contend that health, recreational use, and enjoyment are adversely affected as a result of the Service's decision to allow the use of herbicides in Region 5.

 The doctrine of standing encompasses both constitutional and statutory considerations. Constitutional standing requirements must be satisfied in every federal case. The Article III "cases and controversies" limitation on federal court jurisdiction requires the party who invokes the court's authority to show (1) actual or threatened injury (2) suffered as a result of the allegedly illegal conduct of the defendant, which (3) fairly can be traced to the challenged action and (4) is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

The Supreme Court more recently summarized these requirements:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore* [*v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990)] (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 38, 43, 96 S.Ct. at 1924, 1926.

The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.

*Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (some citations omitted) (footnote omitted).

Statutory standing generally involves a different set of principles and requirements. SRCC seeks judicial review pursuant to Section 10(a) of the Administrative Procedure Act ("APA").[13] This section states in relevant part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. It contains two separate requirements. First, claimants must identify an "agency action" that affects them in the specified fashion; it is judicial review thereof to which they are entitled. "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Where, as here, review is sought under the general review

---

12. This affidavit is similar in context to at least ten other affidavits from individuals who claim to live adjacent to Region 5 and who have been diagnosed as chemically hypersensitive.

13. NEPA does not provide a private cause of action for violations of its provisions.

provisions of the APA, rather than pursuant to specific authorizations in the underlying statutes, the "agency action" must be "final agency action." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990) (citing 5 U.S.C. § 704, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review").

■ Second, parties seeking review under § 702 must show that they have either suffered legal wrong because of the agency action, or are "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." *Id.* at 883, 110 S.Ct. at 3186. To be "adversely affected or aggrieved . . . within the meaning of a statute," a claimant must establish that the injury he or she complains of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the basis . . . [of the] complaint." *Id.* Fortunately, "this test also satisfies the minimum standing requirements of [A]rticle III of the Constitution." *Benally v. Hodel,* 940 F.2d 1194, 1198 (9th Cir.1990).

Contrary to the assertions of the Forest Service, SRCC does not allege a mere "procedural injury" insufficient to sustain Article III standing. In *Defenders of Wildlife,* the Supreme Court held that plaintiffs lacked standing to challenge a regulation excluding actions to be taken in foreign countries from the scope of the Endangered Species Act. The Court noted that the plaintiffs had shown only vague notions of some day visiting, or revisiting, the foreign countries where the potentially affected species were located. The Court held these injuries to be too remote. —— U.S. at ——, 112 S.Ct. at 2146.

The Court rejected the lower court's holding that plaintiffs had standing merely because they suffered a "procedural injury" *id.,* —— U.S. at ——, 112 S.Ct. at 2142, and that "the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Id.,* —— U.S. at ——, 112 S.Ct. at 2143. Rather, the Court reaffirmed that:

[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Id.*

The Court recognized, however, that the case before it was not a case "where plaintiffs [sought] to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Id.,* —— U.S. at ——, 112 S.Ct. at 2142. The Court explained in a footnote:

There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case-law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environment Impact Statement, even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. (That is why we do not rely, in the present case, upon the Government's argument that, *even if* the other agencies were obliged to consult with the Secretary, they might not have followed his advice.) What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

*Id.,* —— U.S. at ———–—— n. 7, 112 S.Ct. at 2142–43 n. 7.

Like the plaintiffs in *Defenders of Wildlife,* SRCC does *not* allege standing for persons who have no concrete interests affected; that is, for "persons who live (and propose to live) at the other end of the country from" Region 5. *See id.,* —— U.S. at ——, 112 S.Ct. at

2143. Doubtless, unfettered use of herbicides in Region 5 in the absence of NEPA compliance will cause harm to visitors' recreational use and enjoyment, if not to their health. Speculation that the application of herbicides might not occur is irrelevant. "The 'asserted injury is that environmental consequences might be overlooked,' as a result of deficiencies in the government's analysis under environmental statutes." *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir.1993) (quoting *Idaho Conservation League*, 956 F.2d at 1518); *see also Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 491 (9th Cir.1987); *Overseas Shipholding Group, Inc. v. Skinner*, 767 F.Supp. 287, 293–94 (D.D.C.1991); *Sierra Club v. Robertson*, 764 F.Supp. 546, 554 (W.D.Ark.1991).[14]

Here, the threatened harm to SRCC's members' health, recreational use, and enjoyment, in the absence of a vegetation management plan that complies with NEPA, "is concrete, specific, imminent, caused by agency conduct in question, and redressable by a favorable ruling." *Seattle Audubon Soc'y*, 998 F.2d at 703. SRCC has standing.

### C.

The Forest Service also contends, in essence, that a challenge to the Impact Statement will not be ripe until a district forester authorizes a specific herbicide application, because only a specific herbicide application

would harm SRCC. We reject the Service's position.

In *Idaho Conservation League*, we held that plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan:

> [I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determined the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

956 F.2d at 1516 (footnote omitted). To the extent the FEIS here sets guidelines that determine future herbicide applications, the Service's failure to comply with NEPA represents a concrete injury.[15] The challenge to the FEIS is ripe for review.

### II. *NEPA Claims*

■ SRCC contends that the district court erred by concluding that the FEIS did not violate NEPA.

### A.

■ NEPA imposes only procedural requirements, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*,

---

**14.** The Court openly recognized in *Defenders of Wildlife* that plaintiffs who are "seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs" have standing. —— U.S. at ——, 112 S.Ct. at 2142. There is no requirement that a plaintiff prove that an injury to his or her concrete interest *will* occur. *Cf. Overseas Shipholding Group*, 767 F.Supp. at 294 (the court concluded that the Supreme Court imposed no such requirement in *National Wildlife Federation*). Indeed, the Court highlighted the absence of this requirement in its conclusion that a person accorded a procedural right to protect his or her concrete interests can assert such right "without meeting all the normal standards for *redressability* and *immediacy.*" *Defenders of Wildlife*, —— U.S. at —— n. 7, 112 S.Ct. at 2142 n. 7 (emphasis added). Here, the record demonstrates that SRCC's members have a concrete interest apart from their interest in having procedure observed.

**15.** In fact, plaintiffs may be unable to challenge the FEIS in response to site-specific actions by

the Forest Service. The Council on Environmental Quality's ("CEQ") tiering regulations instruct agencies to focus *only* on site-specific impacts when analyzing site-specific projects. 40 C.F.R. §§ 1502.20 and 1508.28.

> Section 1502.20 states in part:
> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review.
> Section 1508.28 states in part:
> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

*Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), it does not dictate a substantive environmental result, *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). The policy behind NEPA is to ensure that an agency has at its disposal all relevant information about environmental impacts of a project before the agency embarks on the project. *Id.* at 371–72, 109 S.Ct. at 1858–59; *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 558, 98 S.Ct. at 1219; *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985).

NEPA requires that an environmental impact statement be prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If agency regulations do not categorically require the preparation of an environmental impact statement, then the agency must first prepare an "environmental assessment" to determine whether a project will have a significant effect on the environment. 40 C.F.R. § 1501.4. If, in view of the environmental assessment, the agency determines that its project will significantly affect the environment, then an environmental impact statement must be prepared. 40 C.F.R. § 1501.4.

Focusing on the issues at hand a bit more closely, each national forest prepares a forest plan in accordance with the National Forest Management Act ("NFMA"). Each forest plan is accompanied by an environmental impact statement prepared in accordance with NEPA. The impact statement is "programmatic" in that it is issued along with the NFMA-mandated forest plan. *Sierra Club v. Robertson,* 784 F.Supp. 593, 602 (W.D.Ark. 1991). A comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered.[16] *Id.* at 602–03. If issues develop concerning a specific pro-

ject, the Forest Service may prepare an environmental assessment to determine whether a supplement to the impact statement is required. 40 C.F.R. § 1508.9(a); *Sierra Club,* 784 F.Supp. at 603.

Because NEPA is essentially a procedural statute, a district court's review of an environmental impact statement is principally governed by the APA, 5 U.S.C. § 706(2)(D). *Kunzman,* 817 F.2d at 492. As a result, agency action undertaken "without observance of procedure required by law" may be set aside. *Id.; see also Animal Defense Council v. Hodel,* 840 F.2d 1432, 1435 (9th Cir.1988), *amended,* 867 F.2d 1244 (9th Cir.1989).[17] "The reviewing court[, however,] may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Kunzman,* 817 F.2d at 492. Thus, the environmental impact statement review standard is limited and decidedly deferential to the agency's expertise. *Natural Resources Defense Counsel, Inc. v. Hodel,* 819 F.2d 927, 929 (9th Cir.1987). Where the review involves the interpretation of an agency's regulation, we defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the regulation. *Marathon Oil Co. v. United States,* 807 F.2d 759, 765 (9th Cir.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Furthermore, under this Circuit's "rule of reason," the district court must determine "whether the [impact statement] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" by making "a pragmatic judgment whether the [impact statement's] form, content and preparation foster both informed decision-making and informed public participation." *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982) (internal quotations omitted).

We review the district court's summary judgment that the FEIS is legally adequate under NEPA and the CEQ regulations *de novo. Kunzman,* 817 F.2d at 493.

---

**16.** The CEQ's tiering regulations govern the form, content, and preparation of an environmental impact statement. *See* 40 C.F.R. §§ 1500–1508.

**17.** Review in this context has also extended to whether the impact statement was "arbitrary, capricious, an abuse of discretion, or otherwise not according to law" under § 706(2)(A). *Sierra Club v. Sigler,* 695 F.2d 957, 964 (5th Cir.1983).

### B.

SRCC first contends that the Impact Statement inadequately analyzes the cumulative impact[18] of herbicide use in Region 5; that is, that the FEIS fails to consider sources of herbicides other than the Forest Service. The Forest Service responds that the FEIS indeed considers and analyzes the effects of other sources of herbicides. Furthermore, the Forest Service argues, to the extent cumulative impacts from other sources are not specifically evaluated in the Impact Statement, they are anticipated in the worst case scenario analysis.

The record demonstrates that the FEIS considers and analyzes the effects of other sources of herbicides. *See, e.g.,* FEIS 4–114 ("the diets of exposed people may have some influence on the toxicity of the herbicides. This is one of several factors that may influence the sensitivity of individuals"); FEIS at 4–71 ("it would be very difficult to identify a sample population that would be large enough to differentiate between cancer induced by exposure to an herbicide and that caused by exposure to other environmental factors, such as diet, smoking, polluted air, or drinking water"); FEIS at 4–118 ("cumulative exposures also could occur if an individual used an herbicide on a garden or lawn at the same time as he was exposed to an herbicide from the spray program described in this EIS"). Although the Impact Statement is not exhaustive in this regard, we find that it contains a reasonably thorough discussion. To the extent the FEIS does not specifically evaluate herbicide doses from other sources of exposure, we are convinced that it reasonably anticipates other exposures. The FEIS states:

> [A]dverse health effects from cumulative exposures related to this program were analyzed. The total dose analyzed in the risk assessment estimates exposures from various routes of exposure: eating, drinking, and coming into contact with sprayed vegetation. The risk analysis examines the risk of six of the herbicides causing cancer on the basis of a cumulative lifetime dose assuming a certain number of lifetime exposures for workers and the public. The worst case doses estimated in this analysis are intentional overestimates of exposures likely to occur in this program. Combined exposures from the program and other sources are not likely to exceed these worst case doses.

FEIS at 4–120.

SRCC argues that because future environmental assessments and environmental impact statements will be "tiered" to the present FEIS, they will incorporate the Impact Statement's alleged methodological errors. It is true that cumulative effects of herbicide exposure particular to a site-specific project must be considered in the preparation of site-specific environmental assessments and impact statements under the CEQ's tiering methodology. *See* 40 C.F.R. § 1508.28; *Northern Ala. Envtl. Ctr. v. Lujan,* 961 F.2d 886, 891 (9th Cir.1992). However, when an impact statement is prepared, site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development. *Northern Ala. Envtl. Ctr.,* 961 F.2d at 891; *see* 40 C.F.R. § 1502.20. In studying a particular project, the amount of application, the proximity of the project site to the public, the number of workers, and the number of applications, may raise new and significant environmental impacts that were not previously considered.

The Forest Service represents that it shall fully comply with the stricture of NEPA in evaluating future applications of herbicides in Region 5.[19] Having persuaded the district court that it understands its duty to follow NEPA in reviewing future site-specific programs, judicial estoppel will preclude the

---

**18.** *"Cumulative impact* is the impact of the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

**19.** "Herbicides will be used only after an evaluation of the treatment alternatives (based on effectiveness, environmental effects, and benefit/cost) clearly demonstrates that herbicide use is essential to achieve project objectives." FEIS at 2–17.

Service from later arguing that it has no further duty to consider the cumulative impact of site-specific programs. *Northern Ala. Envtl. Ctr.*, 961 F.2d at 891 (citing *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991)). We "assume that government agencies will ... comply with their NEPA obligations in later stages of development." *Conner v. Burford,* 848 F.2d 1441, 1448 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989).

We conclude that the FEIS's analysis of the cumulative impact of non-specific herbicide applications in Region 5 complies with NEPA.

### C.

SRCC next argues that the Impact Statement fails to disclose the identity, as well as the toxic and synergistic effects, of some of the inert ingredients in herbicide formulations, as required by 40 C.F.R. § 1502.22 (1986).[20] The Forest Service points out that the data gaps for inert ingredients are the result of EPA's "confidential business information" policy, which prohibits the Service from knowing all the ingredients of the formulations. The Service then counters, arguing that, in any event, the worst case analysis, which evaluates the risks of the formulations active ingredients, anticipates the potential risks from the inerts. The Forest Service also highlights the EPA's conclusion, based upon a review of the chemical structure of the known ingredients and available toxicity data, that most of the inert ingredients did not support a specific toxicological concern.

In *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 597–98 (9th Cir.1988), we approved an impact statement in which not all the ingredients of the proposed formulations were known by the Government. The Government reasoned that identified active ingredients, rather than unknown inerts, should be its focus in evaluating herbicide formulations. The Government offered data that cast doubt on the possibility that the herbicide formulations were more toxic than their active ingredients alone. *Id.* at 597–98. To account for any uncertainty regarding the toxicity of the inert ingredients, the Government overstated the risk of harm posed by the active ingredients. *Id.* at 598.

Similarly here, the Forest Service's experts opined that the risk assessment would provide a sound basis for an evaluation of reasonably foreseeable significant adverse effects on the human environment due to known information regarding active ingredients, despite the absence of chronic toxicity data on some inert ingredients.[21]

---

**20.** Section 1502.22 states in pertinent part:

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

**21.** "However, none of the herbicide formulations proposed for use by the Forest Service have undergone chronic toxicity testing, including cancer testing, or any reproductive, developmental, or mutagenicity testing. The inert ingredients in the proposed formulated products might cause cancer or other long-term health effects. Given the little information that is available on

■ "NEPA does not require [that we] decide whether an [environmental impact statement] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." *Friends of Endangered Species*, 760 F.2d at 986. Our task is to ensure that the Forest Service's procedures resulted in a reasoned analysis and disclosure of the evidence before it. *Id.* Furthermore, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if ... a court might find contrary views more persuasive." *Oregon Natural Resources Council*, 490 U.S. at 378, 109 S.Ct. at 1861. The record demonstrates that the Service's action resulted in a reasoned analysis and disclosure of the evidence both before and shortly after the time the Impact Statement was published.

### D.

SRCC argues last that the Impact Statement fails to adequately discuss the risks of herbicide exposure to persons with multiple chemical sensitivities syndrome ("MCSS"), or hypersensitive individuals.[22] SRCC acknowledges that the FEIS accounts for chemically sensitive persons by including a safety factor, but argues that this factor is too small because of the potential for such persons to be hundreds or thousands of times more sensitive than the average population. Relying on its experts, the Forest Service contends that it is the consensus of the scientific community that there is no definable discrete MCSS, and that it cannot be determined what causes a reaction in a chemically sensitive person.

The FEIS expressly considers the effects of herbicide exposure on chemically sensitive individuals. It identifies factors that effect such individuals, considers allergic hypersensitivity, and discusses the likelihood of effects in sensitive individuals. Indeed, the Impact Statement observes:

> Based on the current state of knowledge, individual susceptibility to the toxic effects of the 13 herbicides cannot be specifically predicted.... [S]afety factors have traditionally been used to account for variations in susceptibility among people. This margin-of-safety approach used in the risk assessment takes into account much of the variation in human response ... [A] safety factor of 10 is used for inter-species variation, an additional safety factor of 10 is used for within-species variation. Thus, the normal margin-of-safety of 100 for both types of variation is sufficient to ensure that most people will experience no toxic effects. However, unusually sensitive individuals may experience effects even when the margin of safety is equal to or greater than 100.... In particular, in instances of

each herbicide's formulation, the possibility that the formulated product is more toxic than the active ingredient cannot be discounted entirely. Neither can it be assumed to be true. The possibility that the herbicides' formulations may pose greater risk than their components is largely an untested hypothesis; and as to the herbicides' formulations acute toxicity, ... the possibility should not follow.

Turning to the competing viewpoint, and the one adopted in this EIS, the data gaps about the herbicides as formulated products are irrelevant because the EIS overestimates the risks posed by the active ingredients. Any risk posed by the herbicides as formulated products is considered to be subsumed by the analysis of the active ingredients. Moreover, it is important to remember that each herbicide as a formulated product contains two types of ingredients: active and inert. Each type of ingredient has known and suspected properties. The herbicides' active ingredients have undergone cancer, reproductive, developmental, and mutagenicity tests of varying degrees. The inert ingredients have undergone categorization according to their toxicity and risks, if any. With one exception (kerosene) no herbicide formulations contain inert ingredients of toxicological concern. The Forest Service will continue to monitor the status of inert ingredients in these formulations and conduct further analysis if they are recategorized.

Therefore, based on EPA's classification of the inerts, it is assumed that the risk analysis on the active ingredients sufficiently characterizes the risks of the formulated products...." FEIS at 4–117–118.

22. SRCC defines MCSS as a:

> [S]yndrome where individuals experience adverse, often debilitating, acute and chronic health effects when exposed to *any* amount of an offending substance. Hypersensitivity describes those people whose immune systems have become highly sensitized to herbicides (or other chemicals) and who experience adverse health effect to *minute* amounts, even order of magnitude less than would affect the average person.

the risk assessment where margins of safety are less than 100 for an exposure to a particular herbicide, it is possible that an exposed sensitive individual would experience toxic effects, whereas the average person would not. It must be noted, however, that sensitive individuals compose only a fraction of the population at large and it is not likely that a sensitive individual would be among those few people who might be exposed in any of the Forest Service's applications.

FEIS at 4–115–116.

The district court found this discussion of the effects of herbicide use on sensitive individuals to be adequate. The court explained:

An EIS need not quantify every risk, particularly less likely risks. Moreover, the risk analysis used by the government, a margin of safety of 100, is the scientifically accepted method. The scientific uncertainty regarding the cause and extent of the risks, while not dispositive, does reduce the detail which the EIS can reasonably provide.

*Salmon River Concerned Citizens v. Robertson*, 798 F.Supp. 1434, 1442 (E.Dist.Cal. 1992). The district court's findings and conclusions in this regard are supported by the record. Accordingly, we reject SRCC's contention.

### CONCLUSION

We find that SRCC has standing to challenge the FEIS and ROD. We are compelled, however, to reject SRCC's claims that the FEIS fails to adequately address cumulative effects, evaluate inert ingredients, and disclose and evaluate the risks to chemically sensitive individuals.