117 F.3d 1425
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
ISLAND RANGE CHAPTER OF THE MONTANA WILDERNESS ASSOCIATION,
a non-profit Association; American Wildlands, a non-profit
corporation; Russell Country Sportsmen, a non-profit
corporation; John Ressler, individually; Stuart Lewin,
individually, Plaintiffs-Appellants,
v.
UNITED STATES FOREST SERVICE, Defendant-Appellee.
 No. 96-36133.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 6, 1997.
Decided July 1, 1997.
 
 Before: REAVLEY,** PREGERSON and THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The appellants, several environmental organizations and two individuals, appeal the district court's denial of their request for a preliminary injunction and grant of summary judgment in favor of the United States Forest Service and Forest Supervisor John D. Gorman. In their complaint, the appellants sought a declaratory judgment and injunctive relief, prohibiting timber harvesting and road construction and reconstruction in the Smokey Corridor area of the Lewis and Clark National Forest. The appellants argue the final environmental impact statement (FEIS) violates the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370d; the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1687; and the Clean Water Act (CWA), see 33 U.S.C. § 1365. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.
 
 FACTS
 
 3
 In 1986, pursuant to the NFMA, the Forest Service adopted a land and resource management plan for the Lewis and Clark National Forest (Forest Plan). In 1991, the Forest Service initiated plans for the Smokey Corridor timber sale. The portion of the forest affected is in Montana.
 
 
 4
 Pursuant to the NEPA, the Forest Service released a draft environmental impact statement (EIS) in July 1993. The draft EIS included a no-action alternative and six action alternatives. The Forest Service identified its preferred alternative as alternative 7. This alternative permits the harvesting of 2,999 acres of land.
 
 
 5
 The Forest Service issued its FEIS in January 1994. The Forest Supervisor then issued a Record of Decision (ROD), implementing alternative 7. The appellants filed an administrative appeal of the final EIS and ROD. The Deputy Regional Forester denied the appeal and the appellants filed the present action. The district court granted summary judgment in favor of the Forest Service on all issues and denied the appellants' request for a preliminary injunction. The appellants now appeal.
 
 DISCUSSION
 A. Range of Alternatives
 
 6
 The appellants first argue the FEIS violates the NEPA because the Forest Service failed to consider a reasonable range of alternatives in the FEIS. Specifically, the Forest Service proposed closing or restricting the same 53.1 miles of road in each action alternative as a measure to mitigate the effects on elk security. The appellants argue the FEIS is defective because the FEIS did not consider a range of alternatives to the road closures and restrictions. We disagree.
 
 
 7
 We apply a "rule of reason" to determine whether the FEIS "contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " City of Carmel-by-the-Sea v. United States Dep't of Transp., 95 F.3d 892, 899 (9th Cir.1996) (quoting Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 703 (9th Cir.1993)). "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir.1992) (quotations and citation omitted); see also Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process.").
 
 
 8
 The FEIS explains the road closures/restrictions is a mitigating measure to alleviate the adverse effects of the action alternatives on elk security. The appellants have produced no authority that the Forest Service is required to consider alternatives to a proposed mitigating measure. Because the road closures/restrictions will mitigate the adverse effects, there is no reason to require the action alternatives to propose different road closures in different areas.
 
 
 9
 Further, the FEIS contains "a reasonably complete discussion of [the] possible mitigation measure[ ]...." Robertson, 490 U.S. at 352. Appendix L to the FEIS provides the names of the roads affected, a map locating the affected roads, and whether the particular road closure/restriction is intended to promote elk security or some other purpose. The information provided within the FEIS demonstrates the Forest Service took a "hard look" at the road closure/restriction issue.
 
 B. Data on Elk Population
 
 10
 The appellants argue the FEIS violates the NFMA because the Forest Service did not conduct an appropriate study to obtain data on the elk population in the project area.
 
 
 11
 The Forest Service designated elk as a management indicator species (MIS). Regulations promulgated under the NFMA provide that "[p]opulation trends of the [MIS] will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6).
 
 
 12
 In the FEIS, the Forest Service estimates there are 500 to 1,000 elks in the project area. The FEIS provides ample information on the project's affects on elk security and the measures needed to protect elk security and habitat. The Forest Service's monitoring of the elk population was not arbitrary. See Inland Empire Pub. Lands v. United States Forest Serv., 88 F.3d 754, 762-63, 763 n. 12 (9th Cir.1996).
 
 C. Elk Security Cover
 
 13
 The appellants next argue the FEIS violates the NEPA because the FEIS does not apply the Hillis method to define elk security areas. The Hillis method provides that 30% of an area should be maintained as elk security areas.
 
 
 14
 The Forest Service was entitled to choose the method it deemed most appropriate for determining elk security areas. "NEPA does not require that we decide whether an [FEIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1359 (9th Cir.1994) (quotations and citation omitted).
 
 
 15
 The Forest Service explains the Hillis method was developed for the western side of the Rocky Mountains and it determined the 30% requirement is not an appropriate figure for the project area because this area is on the eastern side of the Rocky Mountains. The Forest Service was not obligated to adopt the Hillis method. See id.
 
 D. Old Growth Standards
 
 16
 The appellants also argue the FEIS violates the NEPA because the Forest Service failed to obtain data on the age of the trees in its old growth inventory. The appellants further argue the FEIS violates the NFMA because it does not comply with the Forest Plan's requirement that 5% of a timber compartment be maintained as old growth.
 
 
 17
 Again, we may not resolve disputes amongst experts as to the preferred method for measuring old growth. See Salmon River, 32 F.3d at 1359; Inland Empire, 992 F.2d at 981. Although the Forest Service recognizes age as an important factor, the Forest Service also has determined that "age is often the least reliable data in an inventory."
 
 
 18
 In inventorying the old growth, the Forest Service analyzed maps, an electronic database, and aerial photographs. The Forest Service also performed field checks to acquire information on the structural characteristics of the timber stands. This inventory was sufficient--the Forest Service was not required to actually bore holes into the trees to determine the ages.
 
 
 19
 Also, the FEIS is not inconsistent with the Forest Plan's 5% requirement. The FEIS states the 5% requirement will be met in all but three compartments. The FEIS explains that the existing levels in these three compartments do not meet the 5% requirement. The FEIS, however, further states that no harvesting of old growth will occur in these three compartments. Thus, the proposed timber harvest will not result in the further depletion of existing old growth stands in these three compartments.
 
 E. Supplemental EIS
 
 20
 The appellants also argue the Forest Service violated the NEPA by failing to prepare a supplemental EIS for the Smokey B timber sale. The appellants assert the Smokey B sales package differs significantly from alternative 7 as discussed in the FEIS.
 
 
 21
 The Forest Service "shall" prepare a supplement to an FEIS if the Forest Service "makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i), (ii). "[N]ot every new circumstance, however small, requires filing a SEIS; the new circumstance must present a seriously different picture of the environmental impact of the proposed project from what was envisioned." Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir.1987).
 
 
 22
 The Forest Service's decision not to prepare a supplement was not arbitrary. The Forest Service used a Timber Stand Management Reporting System database (TSMRS) to identify the acres to be harvested, as described in the FEIS. The acres to be actually harvested, as identified in the Smokey B sales package, were determined by traversing the area. The Forest Service explains "a plus or minus 10% difference [exists] between true ground acres (traversed acres) and acres in the TSMRS database."
 
 
 23
 The differences in acres to be harvested are within this range of variability. The Forest Service explains the differences are "typical of the types of minor adjustments that result because of the differences of scale between an EIS and timber sale layout" and did not result in a substantial change in the project.
 
 
 24
 The Forest Service took a "hard look" at the effect of the changes and was not required to prepare a supplemental EIS.
 
 F. Westslope Cutthroat Trout
 
 25
 The appellants argue the FEIS violates the NFMA because it fails to provide for a viable population of the Westslope Cutthroat Trout (WCT). We disagree.
 
 
 26
 Regulations require the Forest Service to "maintain viable populations of existing native species ... in the planning area." 36 C.F.R. § 219.19. The FEIS states the only pure population of WCT is located in the North Fork of Deadman Creek. The FEIS explains that the habitat conditions for the WCT are expected to improve with the implementation of alternative 7. Thus, with the implementation of alternative 7, the Forest Service has taken sufficient steps to ensure a viable population of WCT in the project area.
 
 G. Clean Water Act
 
 27
 The appellants also argue the timber harvest will violate the Clean Water Act (CWA). The CWA requires each state to develop and implement water quality standards. 33 U.S.C. § 1313; Oregon Natural Resources Council v. United States Forest Serv., 834 F.2d 842, 848 (9th Cir.1987). The CWA requires the Forest Service to comply with the state's water quality standards. 33 U.S.C. § 1323; Oregon, 834 F.2d at 848; Marble Mountain Audubon Soc'y v. Rice, 914 F.2d 179, 182 (9th Cir.1990).
 
 
 28
 The appellants argue the project violates state water quality standards by harming the WCT. As explained above, however, the project mitigates the one area in which true populations of the WCT exist.
 
 
 29
 The appellants also challenge the Forest Service's analysis of the predicted sedimentation. In its analysis, the Forest Service applied the Best Management Practices (BMPs) developed by Montana. "Proper implementation of state-approved BMP's will constitute compliance with the CWA unless water quality monitoring reveals that the BMP's have permitted violation of these water quality standards." Oregon Natural Resources Council v. Lyng, 882 F.2d 1417, 1424 (9th Cir.1989), as amended, 899 F.2d 1565 (9th Cir.1990). The appellants have not identified any potential violations.
 
 
 30
 Based on its analysis, the Forest Service concluded that increased sedimentation could have some short-term effects on spawning areas. The Forest Service, however, predicts that "94% to 100% recovery to current levels [will] occur within the four years following ground disturbing activities." The Forest Service sufficiently analyzed the sedimentation issue and reached reasonable conclusions regarding the effects.
 
 
 31
 AFFIRMED.
 
 
 
 **
 The Honorable Thomas M. Reavley, Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3