CENTER FOR BIOLOGICAL DIVERSITY; et al., Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; et al., Defendants.

California Transportation Ventures, Inc; San Diego Expressway, L.P. Intervenor–Defendants.

No. 01CV1876JM(POR).

United States District Court, S.D. California.

March 10, 2003.

Everett L. DeLano, III, Law Offices of Everett L. DeLano, III, Escondido, CA, for Plaintiffs.

Thomas Stahl, US Attorney CV, US Attorneys Office, San Diego, CA, Barry A. Weiner, US Dept. of Justice, General Litigation Section, Martha C. Mann, US Dept. of Justice, Environmental Defense Section, Washington, DC, for Defendant.

Robert D. Thornton, Law Offices of Robert D. Thornton, Irvine, CA, for Intervenor–Defendant.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' AND INTERVENORS' CROSS MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF; DENYING OBJECTIONS TO DISCOVERY ORDER; GRANTING DEFENDANTS' MOTION TO STRIKE; GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE

MILLER, District Judge.

Plaintiffs Center for Biological Diversity, Preserve South Bay, San Diego Audubon Society, Sierra Club and Preserve Wild Santee (collectively "Plaintiffs") move for summary judgment on grounds that defendants Federal Highway Administration, U.S. Fish & Wildlife Service, and the U.S. Army Corps of Engineers (collectively "Federal Defendants") failed to comply with federal environmental laws. Plaintiffs also seek to enjoin the developers of the project, California Transportation Venture, Inc. and San Diego Expressway, L.P. (collectively "Intervenors"), from continuing with any construction related activities. The Federal Defendants and Intervenors oppose the motion and have filed cross-

motions for summary judgment. Having carefully considered the record before the court, pertinent legal authorities, and the arguments of counsel, the court, for the reasons set forth below, denies Plaintiffs' motion for summary judgment; grants Defendants' and Intervenors' motion for summary judgment; denies Plaintiffs' motion for injunctive relief; denies Plaintiffs' objections to Magistrate Judge Porter's discovery order; grants Defendants' and Intervenors' motion to strike; and grants in part and denies in part Plaintiffs' motion to strike. The Clerk of Court is instructed to close the file.

## BACKGROUND

### General Overview

Plaintiffs commenced this action to challenge the Federal Defendants' actions in approving and issuing permits for a new toll road located in Southeastern San Diego County known as State Route 125 South (hereinafter "SR 125"). Plaintiffs allege that the alignment of the 11.2 mile toll road cuts across the habitat of many endangered and threatened species, and would bisect and fragment one of Southern California's largest remaining intact vernal pool complexes. The toll road will also allegedly facilitate and induce commercial and residential development in an imperiled ecosystem. Plaintiffs seek injunctive and declaratory relief asserting that the permit approvals violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Department of Transportation Act ("DOTA"), 49 U.S.C. § 303(c), and the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*

This case aptly illustrates the unassailable reality that Congress has vested authority in several federal agencies for the balancing of factors relevant for review and approval of proposed highway projects. The voluminous record, in excess of 47,000 pages, has been created over an expanse of many years and addresses a myriad of substantive areas including but not limited to socioeconomic factors, air quality, noise, water issues, traffic, erosion, flood plain considerations, visual assessments, population growth and consequences to plant and animal species.

In 1959, the State of California added SR 125 to the State freeway system and in 1984 SR 125 was added to the Regional Transportation Plan as a part of a federally approved twenty year plan for transportation improvements. In 1991, the State of California selected California Transportation Ventures, Inc. ("CTV") to design, build, operate and maintain the SR 125 project.[1] Pursuant to the franchise agreement, CTV is responsible for identifying and obtaining all permits required to construct the project. To date, Intervenors have invested approximately $30 million in the project, including costs associated with obtaining regulatory approvals.

The environmental documentation prepared for SR 125 was a joint effort of FHWA, FWS, the Corps, California Department of Transportation ("Caltrans"), with assistance from CTV as well as involvement of other state, federal and local agencies, and the public. Before the Draft Environmental Impact Statement ("DEIS") was issued for public comment in 1996, numerous technical and other studies were prepared between 1993 and 1995. FHWA 16172–813.[2] After consideration of

1. On September 9, 1992, CTV assigned its rights to construct SR 125 to San Diego Expressway, LP, a California limited partnership.

2. The Administrative Record consists of 47,-111 pages organized by agency. The Federal Highways Administration portion of the record is cited as "FHWA [page number]," the U.S. Fish & Wildlife portion as "FWS [page

the comments received on the DEIS and coordination with federal and state resource/regulatory agencies, local jurisdictions, the public and affected communities, a preferred alternative for the SR 125 was identified on March 4, 1997.

On February 26, 1999, the FWS issued a Biological Opinion ("BiOp") on the effects of the preferred alternative on several threatened and endangered species concluding that SR 125 is not likely to jeopardize the continued existence of the species, and is not likely to destroy or adversely modify critical habitats. On March 10, 1999 the Corps identified the preferred alternative as the Least Environmentally Damaging Practicable Alternative ("LEDPA") in accordance with the CWA.

Upon discovery of a Quino checkerspot butterfly within the alignment area of SR 125, in April 1999 a Supplemental Draft Environmental Impact Statement ("SDEIS") was circulated for public comment. FHWA 22381–472. After consideration of the SDEIS, on January 21, 2000 the FHWA released the Final Environmental Impact Statement ("FEIS"). FHWA 27855–29238.

On April 19, 2000 Caltrans and CTV applied to the Corps for a permit seeking to fill 10.58 acres of "waters of the United States" in connection with the SR 125 project. After the Corps evaluated and reviewed the FEIS, the Corps elected to adopt the FEIS and further determined that additional analysis was necessary to document compliance with NEPA Section 404(b)(1) Guidelines. Following additional public notice and comments, on July 30, 2001 the Corps issued its Environmental Assessment ("EA") and Record of Decision ("ROD"). COE 6058–96.

The FWS issued a second BiOp on June 11, 2002 addressing the effects of SR 125

on the California gnatcatcher and the Quino checkerspot butterfly. FWS 7404. This was the final permit required before CTV could commenced construction of SR 125.

*Brief Description of the Project*

The selected alternative for SR 125 spans approximately 11 miles, from Route 54 in Bonita/Spring Valley to Route 905 on Otay Mesa. FWHA 31146. SR 125 includes a maximum of eight mixed flow lanes in the northern segment and six mixed flow lanes from Olympic Parkway to Otay Mesa Road in the southern segment. The median is wide enough to accommodate two possible HOV lanes or transit facilities in the future.

The project will be built in stages. The initial stage includes four lanes with at least five local interchanges, including the freeway to freeway interchange with Route 54. FHWA 31146–47. SR 125 will be widened progressively to six lanes and later to eight lanes north of East "H" Street, including the construction of additional interchanges, to meet growing traffic needs, as required under Section 3.2(e) of the Franchise Agreement. FHWA 27967.

SR 125 will be operated as a toll facility until construction bonds are repaid. FHWA 27934. The project also includes mainline and interchange toll collection plazas, including electronic transponders that will allow regular toll users to bypass the toll plazas. FHWA 27935.

*The Challenged Permits*

Plaintiffs challenge the issuance of the following permits:

— The Final EIS and Record of Decision ("ROD") issued under NEPA by Federal Highway Administration ("FHWA").

number]," and the U.S. Corps of Engineers

portion as "COE [page number]."

— The Final Section 4(f) Analysis and Record of Decision issued by FHWA under Section 4(f) of the DOTA.

— The 1999 and 2001 biological Opinions ("BiOps") issued by the U.S. Fish & Wildlife Service ("FWS") under Section 7 of the ESA.

— The Permit issued on July 20, 2001 under Section 404 of the CWA by the U.S. Army Corps of Engineers ("Corps").

In September 2002 Plaintiffs learned that CTV intended to commence pre-construction activities. On October 18, 2002 the court denied Plaintiffs' motion for a temporary restraining order and on December 23, 2002 the court denied Plaintiffs' motion to preliminarily enjoin the presently ongoing activities.

The parties have filed cross-motions for summary judgment. In the event Plaintiffs prevail on their motion, they also seek to enjoin any further construction activities.

## THE MOTION FOR SUMMARY JUDGMENT

### Legal Standards

#### Summary Judgment Standard

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (citation omitted). Summary judgment is not "a disfavored procedural shortcut" but is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Id.* at 324, 106 S.Ct. 2548.

#### Administrative Procedures Act Standard

In general, judicial review of actions under NEPA is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. The APA provides that any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and shall be overturned by the court. 5 U.S.C. § 706(2)(A); *California v. Norton*, 311 F.3d 1162, 1170 (9th Cir.2002). "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." *Laguna Greenbelt, Inc. v. U.S. Dept. Of Transp.*, 42 F.3d 517, 523 (9th Cir.1994). Under this standard, the "court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Nevertheless, "the agency must examine the relevant data and articulate a satisfactory explanation" for its decision and, in reviewing that explanation, the court must consider whether the decision was based on a consideration of the relevant factors and whether there

was a clear error in judgment. *Id.* This inquiry must "be searching and careful" but "the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Natural Resources Defense Council, Inc. v. Hodel,* 819 F.2d 927, 929 (9th cir.1987) (the court applies deferential standard of review to Environmental Impact Statements).

> When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance— or lack of significance— of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ In considering a NEPA challenge, the court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Laguna Greenbelt,* 42 F.3d at 523 (quoting *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987)). Under the "rule of reason," the court determines " 'whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environ-

mental consequences' by making 'a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation.' " *Id.* (quoting *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994)).

### *The NEPA Claims*

#### *Undue Influence*

■ Plaintiffs assert that an entity related to the Intervenors, Parsons Brinckerhoff ("PB"), prepared a portion of the FEIS and possesses a direct financial interest in the project. Plaintiffs conclude that FHWA violated the law by (1) permitting a party with financial interest in the project to prepare the EIS and (2) failing to obtain financial disclosure forms from PB. This argument is not persuasive.

The regulations at issue provide, in pertinent part:

> It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

40 C.F.R. § 1506.5(c). In support of their argument, Plaintiffs submit evidence show-

ing that PB had a financial interest in the project through Intervenors and that FHWA was fully aware of this relationship. FHWA 13350 (FHWA counsel notes that PB "has an obvious financial interest in the outcome of the environmental process—any 125 South alternative is OK, but they are out of luck, and probably a great deal of money if the no-build or a freeway alternative is selected."); FHWA 14931 (expressing concern that Intervenors efforts to influence the process were "decidedly inappropriate").

■ To place Plaintiffs' claim in context, the court observes that Caltrans, and not FHWA prepared the EIS, and that NEPA specifically authorizes the delegation of such authority to Caltrans. *See* 42 U.S.C. § 4332(D). The List of Preparers for the SR 125 South project includes Caltrans/FHWA and eleven private firms, for a total of 106 persons. FHWA 28422–28429. There is no dispute amongst the parties that the relationship between PB and Intervenors was fully disclosed and a subject of debate at FHWA; nor is it disputed that the participation by a financially interested party in drafting an EIS does not automatically result in the rejection of an EIS. *See; Sierra Club v. Marsh,* 714 F.Supp. 539, 556 (D.Me.1989) (federal agency maintains sufficient oversight by monitoring progress and providing significant input into the process); *Essex County Preservation Assn. v. Campbell,* 536 F.2d 956, 959–60 (1st Cir.1976) (design engineer for highway project may participate in drafting the EIS). Furthermore, the regulations specifically state, "nothing in this section is intended to prohibit any agency from requesting any person to submit information ... to any agency." 40 C.F.R. § 1506.5(c).

The court concludes that the ultimate question raised by Plaintiffs is whether the financial interest of PB compromised the objectivity and integrity of the NEPA process. *See Associations Working for Aurora's Residental Env't v. Colorado Dep't of Transp.,* 153 F.3d 1122, 1129 (10th Cir. 1998). The court concludes that it does not. First, the financial interest of PB in Intervenors was indisputably, fully disclosed. Second, PB did not prepare the EIS, rather, it provided technical information concerning only a portion of EIS. Finally, and most persuasively, the information provided by PB was independently reviewed by FHWA and carefully analyzed by Caltrans. The Transportation Equity Act provides that a state may procure the services of a consultant to prepare an EIS provided that the "State conducts a review that assess the objectivity of the environmental assessment, environmental analysis, or environmental impact statement." 23 U.S.C. § 112(g). The record reflects that both FHWA and Caltrans took this duty seriously. With respect to the conflict of interest, one e-mail from the FHWA reveals:

> There is no reason that Caltrans should not receive or consider material developed by Parsons Brinkerhoff. However, the Federal Highway Administration cannot use any environmental document that relies on Parsons Brinkerhoff information and analysis unless Caltrans can demonstrate to our satisfaction that the information and analysis is unbiased.

FHWA 13345. Aware of their duty to independently review matters submitted by PB, Caltrans responded to FHWA by explaining why Caltrans had "decided that staff and resources from California Transportation Ventures would be used to provide technical assistance/services for various phases of the development of the Draft EIS. All technical assistance/services provided by California Transportation Ventures [were] performed at Caltrans' direction and [were] subject to Caltrans' oversight." FHWA 14860. The record reveals correspondence between agencies buttressing the

argument that oversight functions were transmitted to the FHWA: FHWA independently evaluated the record, participated in project meetings, assisted in coordinating comments from other agencies, provided oversight to the process and required changes to the EIS. FHWA 27847–53; 22366–72; 15510–606.

Accordingly, the court concludes that the FEIS is not inadequate or contrary to law based upon this procedural claim.

### Cumulative Impacts

■■■ Plaintiffs assert that the FEIS failed to adequately consider the cumulative impacts of the project, including impacts such as noise, water, air, traffic and wetlands. The EIS must include consideration of cumulative impacts which result from the incremental impact of the proposed action when added to other past, present and reasonably foreseeable future actions. 40 C.F.R. § 1508.7. An EIS must take a "hard look" at the separate and cumulative environmental effects of their proposed actions, including a study and evaluation of a reasonable range of alternatives to minimize or avoid those effects. *See Oregon Natural Resources Council v. Marsh,* 52 F.3d 1485, 1488 (9th Cir.1995). An EIS must "catalogue adequately past projects in the area" and it must present a "useful analysis of the cumulative impacts of past, present and future projects." *City of Carmel–By–The–Sea v. U.S. Dept. of Transp.,* 123 F.3d 1142, 1160 (9th Cir. 1997). "The EIS must analyze the combined effects of the actions in sufficient detail to be 'useful to the decisionmaker in deciding whether, or how to alter the program to lessen cumulative impacts.'" *Muckleshoot Indian Tribe v. U.S. Forest Service,* 177 F.3d 800, 810 (9th Cir.1999);

*Churchill County v. Norton,* 276 F.3d 1060, 1080 (9th Cir.2001).

■■■ In constructing its argument, Plaintiffs rely primarily on documents prepared by the EPA which expressed concerns over the adequacy of information to properly assess the cumulative impacts of SR 125. For example, in an attachment to a March 30, 2001 letter from an EPA Regional Administrator to a Corps District Engineer, it was stated, "the applicant has not demonstrated that the proposed project is in compliance with the 404(b)(1) Guidelines, and, in accordance with our previous letter, we recommend you deny the permit." COE 05804. It was further noted that "there has never been a comprehensive analysis of the number of local interchanges needed by the three local entities . . ., nor a comprehensive analysis of their proposed siting such that adverse impacts to water of the United States can be avoided and minimized to the fullest extent possible." COE 05807. Based upon these and related comments, Plaintiffs generally contend that construction of SR 125 will lead to substantial growth along the SR 125 corridor and that these cumulative effects, involving thousands of new residents and businesses were not properly considered. Plaintiffs further assert that the EIS is defective because it did not analyze anticipated arterials and interchanges in the EIS. "[W]here several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS." *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990).

While there are weaknesses in the record on the cumulative impacts,[3] the court concludes that the FEIS contains a rea-

---

**3.** An example of the perceived weakness is an April 6, 2000 E-mail from FHWA to EPA wherein FHWA responded to the EPA's inquiry about cumulative impacts in the following way:

We agree that although each development in the impacted area, along with its impacts, was identified and described in the FEIS, a cumulative summary of the impacts of these various projects is not readily iden-

sonably thorough evaluation of the significant cumulative impacts of the project, describes the effects of those impacts, and considers the magnitude of those effects when combined with those of SR 125. This analysis and deliberative process complies with the rule of reason articulated in *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346 (9th Cir.1994). The FEIS identifies the effect of planned growth in the short and long term and the potential effects of long term of planned and unplanned growth in the area. The FEIS also discusses the impact of the large number of development projects which will impact the region and the reasonably foreseeable effects of these projects. FHWA 28587–28606. The FEIS discusses the cumulative impacts, FHWA 28238–28245, and the mitigation of environmental impacts by means of the Multi–Species Habitat Conservation Plan ("MSCP") approved by FWS and the Cal. Dept. of Fish and Game being implemented by local jurisdictions in the SR 125 project area. FHWA 28242. Intervenors also respond that the FEIS considered the future environmental effects of future development projects. FHWA 28587–28606. The FEIS also notes that SR 125 will have an effect on the rate of development. FHWA 28115. Defendants cite projects in the area which indicate that the area will develop with or without SR 125. FHWA 31186.

■ The court finds that reliance upon the MSCP, FWS 00022 et seq., approved by FWS and the California Department of Fish and Game, is neither arbitrary, capricious, or contrary to law. As noted in the FHWA Record of Decision,

The Multi–Species Conservation Plan study area, evaluated in the MSCP EIS,

contains much of the current or proposed urbanization in the southern San Diego County area, and encompasses all of the Route 125 South project area. Focusing on the establishment of a large scale preserve for conservation of biological resources, the MSCP also provides for allowing development outside the preserve area which will be mitigated by conservation inside the preserve. By establishing areas which are off limits for development, and authorizing development to proceed, notwithstanding biological impacts, outside the preserve areas, the MSCP, and the development contemplated under the MSCP and MSCP EIS provide additional demonstration that the growth associated with the Route 125 South project area has been addressed on a regional basis.

FHWA 31187. The MSCP provides a comprehensive analysis of the environmental impacts on Southern San Diego County and provides for mitigation of those effects. The analysis also noted that the growth inducing effects of SR 125 are minimized by local and regional land use plans, including the MSCP, in the project area. FHWA 28238. Such reliance upon MSCP is not improper. *See Laguna Greenbelt,* 42 F.3d at 524 n. 6 (rejecting the notion that reliance on state environmental documents was improper and noting, "NEPA mandates state and federal coordination of environmental review"); *Stop H–3 Association v. Dole,* 740 F.2d 1442, 1462 (9th Cir.1984), *cert. denied, Yamasaki v. Stop H–3 Association,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985) (cumulative effects may be considered in context of local plans); *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d

tified. We will summarize and identify the impacts of the individual projects... As we noted in our meeting, open and frequent communication is critical to the coopera-

tion needed between our agencies on projects such as this.
FHWA 29890.

1152, 1185 ns. 11, 12 (10th Cir.2002) (noting the policy of intergovernmental agency cooperation to the "fullest extent possible" to reduce duplicative efforts).

Plaintiffs' argument that EPA's analysis and conclusion concerning the adequacy of the EIS renders the EIS arbitrary, capricious and contrary to law is not persuasive. *See League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181 (9th Cir.2002) (the views of an administrative agency is one "factor pointing toward the inadequacy of the EIS"). While the views of the EPA on the adequacy of the EIS weigh against a finding of adequacy, the court concludes that the EIS contains a reasonably complete discussion of cumulative impacts and measures to mitigate those impacts. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). This court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Kunzman*, 817 F.2d at 492; *Swanson v. U.S. Forest Service*, 87 F.3d 339, 343 (9th cir.1996) ("This court need not 'flyspeck' the [environmental] document and 'hold it insufficient on the basis of inconsequential, technical deficiencies,' but will instead employ a 'rule of reason' in evaluating an EIS."). The record reflects that FHWA considered noise, traffic, air quality and traffic congestion impacts emanating from other developments. FHWA 28587–606. Applying the deferential standard of review, the record demonstrates that the FEIS considered and analyzed the cumulative impacts and that it reached an informed decision.

Plaintiffs also argue that the EIS failed to adequately consider the cumulative effects related to arterial roadways and in-

terchanges and cites comments by the EPA and Corps that the analysis is incomplete. FHWA 27906; COE 05554. The court notes that the Record of Decision discusses reasonably foreseeable arterial highway improvements, and notes that decisions about the location and timing of interchanges between SR 125 and local arterials are made by local governments. FHWA 31183–85. The impacts of these future arterials are considered in the traffic projections and specific local arterials were considered. FHWA 27913, 27951, 27898, 27976–98. The Record of Decision further notes that "[a]s the EPA acknowledges, a general evaluation of the impact of the arterials is appropriate where, as here, the proposed highway does not fix the precise location of the arterials." FHWA 31183. With respect to the 905 interchange, it is independent from SR 125, and not encompassed within the scope of cumulative impacts. *See Coalition on Sensible Transportation, Inc. v. Dole*, 826 F.2d 60, 69 (D.C.Cir.1987). Moreover, the FHWA ROD outlines the scope of the 905 interchange and notes its impact on wetlands and vernal pools. FHWA 31185–86.

In sum, the court concludes that the analysis of the cumulative impacts complies with the rule of reason and is neither arbitrary, capricious, nor clearly erroneous.

*Segmentation*

▆▆ Plaintiffs argue that Defendants illegally segmented the project in violation of NEPA. NEPA requires that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).[4] One of the pur-

---

**4.** NEPA defines "connected actions" as:
 Actions are connected if they:
 (I) Automatically trigger other actions which may require environmental impact statements.

 (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

poses of SR 125 is to facilitate urbanization of Southern San Diego County, FHWA 27895, and construction of the highway is anticipated to result in $5.5 billion in development in the Otay Mesa region of San Diego County. FHWA 27901. Plaintiffs' argument is that there are at least 38 development projects (three of which are specifically conditioned on the construction of SR 125) that the highway will serve and that Defendants had "an obligation to treat those projects as connected actions." (Motion at p. 16:5). Similarly, Plaintiffs contend that the FEIS did not consider the environmental effects of the potential future construction of SR–905.

In constructing their argument, Plaintiffs rely upon *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985). There, the Forest Service prepared an EIS for the construction of a gravel road in a forested area of Idaho. The purpose of the road was to facilitate timber sales. The Forest Service contemplated development of a ten unit plan to log the area. In the EIS, the Forest Service noted that it would develop a separate EIS for each of the ten units. Eventually the Forest Service issued Environmental Assessments for three of the units. The Ninth circuit concluded that the agency failed to consider the road and timber sales in the same EIS because subsections 40 C.F.R. §§ 1508.25(a)(1)(ii) and (iii) were satisfied. "It is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales. The record also revealed that two of the approved sales 'were awaiting only the approval and construction of the road before going forward.'" Finding the road and timber sales "inextricably intertwined and connected actions," the Ninth Circuit concluded that a single EIS should have been prepared which considered the cumulative effects of the road and timber sales. By analogy to *Thomas,* Plaintiffs conclude that the FEIS is defective because it failed to consider connected actions. Plaintiffs cite to a document indicating that three development projects would require the construction of Route 125 prior to their development.[5] FHWA 27901. The documents also indicate that SR 125 "is being developed concurrently with other extensive development activities planned in the project area." *Id.* Plaintiffs conclude that the FEIS is inadequate because it failed to consider these projects.

This argument is not persuasive. The proposed three private development projects are not federal projects subject to FHWA oversight. *See Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986). Federalization occurs when the projects "are so functionally interdependent that the projects constitute a single federal action." *Enos v. Marsh,* 769 F.2d 1363, 1371 (9th Cir.1985) (rejecting argument that EIS for a federal harbor must take into consideration environmental impacts of shoreside facilities, such as berthing areas, terminals, roadways and utility improvements). Unlike *Thomas,* where the logging roads were constructed to facilitate timber sales, SR 125 has independent utility to reduce traffic congestion, accidents and fatalities, and to facilitate the transportation needs of South San Diego County. In the scheme of project development, the three dependent development projects are only tangentially related to the development of SR

---

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

**5.** The three projects are the Rolling Hills Ranch project (Phases II and III), the San Miguel Ranch project (Phase III), and Otay Ranch Urban Center. These projects are discussed in Appendix C to the FEIS. FHWA 28587–28606.

125. Even if the planned development projects do not occur, the SR 125 project has independent utility. This important factor alone distinguishes *Thomas* and compels the conclusion the other projects are not "connected actions" under NEPA regulations.[6] Accordingly, judgment in favor of defendants is appropriate on this claim.

### Consideration of Project Alternatives

Plaintiffs claim that Defendants failed to conduct an adequate analysis of project alternatives under Section 4(f) of the Transportation Act, to adopt the LEDPA, and to comply with NEPA's requirements. Each argument is discussed in turn.

*Section 4(f)*

 Plaintiffs argue that the FEIS fails to adequately analyze alternatives to the proposed project. Section 4(f) of the DOTA prohibits the Secretary of Transportation from approving any project that requires the use of parkland unless (1) there is no prudent and feasible alternative to the use of the site, and (2) all possible planning has been taken to minimize harm to the site. 49 U.S.C. § 303(c). Under Section 4(f), the court must evaluate whether the agency's reasons for rejecting each alternative are legally sufficient and whether those reasons are supported by the record in light of a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Supreme Court articulated three factors to guide judicial review of a Section 4(f) determination. The court must first determine whether the Secretary acted within the scope of its authority. That is, whether the Secretary could have reasonably believed that there were no feasible or prudent alternatives. *Id.* at 416, 91 S.Ct.

814. Second, the court determine whether the Secretary's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). Finally, the court must determine "whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. 814.

Plaintiffs argue that the alignment of SR 125 will take a portion of Sweetwater Regional Park and that two of the alternatives studied in the FEIS would have avoided Section 4(f) resources entirely: (1) the no-build alternative and (2) an alternative involving the taking of a portion of the golf course.[7] While these alternatives are mentioned in the FEIS, Plaintiffs conclude that the analysis is insufficient and that the FEIS fails to establish the "unusual situation" that would allow for the taking of Section 4(f) resources.

 The record amply demonstrates that the "no build" alternative was considered and properly rejected. "The No Build Alternative, however, would not meet the regional transportation need. With the No Build Alternative, congestion would continue to increase on both regional and local facilities, including the I–5 and I–805." FHWA 31153. Construction of SR 125 is anticipated to result in the net reduction of approximately 5,300 accidents and 500 fatalities over a 15 year period. FHWA 27897. The no build alternative simply does not satisfy the purpose of the project "to provide for effective transportation of people, goods, and services, [ ], to accommodate traffic growth associated with the planned and approved development in San Diego County, to relieve existing congestion on Otay Mesa Road, to

---

**6.** The court observes that the three development projects are discussed, although not in significant detail, in Appendix C. FHWA 28587–606.

**7.** Plaintiffs identify that SR 125 will take over 40% and 25% of areas known as Area 19 and Area 20 within Sweetwater Park, respectively, for a total taking of 63.9 acres.

provide a regional transportation connection to the International Port of Entry at Otay Mesa, and to help achieve the goals of the San Diego County Regional Transportation Plan of reducing emissions from transportation sources and providing a balanced transportation system by reducing out of direction travel." FHWA 28454. Based upon this record, the Secretary acted within the scope of his authority, the decision is not arbitrary, capricious, or contrary to law, and the Secretary followed necessary procedural requirements.

 The analysis with respect to the Golf Course Alternative is more involved. In all, the Secretary considered ten different routing options for SR 125. FHWA 28455. Plaintiffs argue that the modified version of the "Golf Course Alternative" would have completely avoided Section 4(f) resources and therefore was inadequately analyzed. The FEIS identifies that five alternatives to an alignment through Sweetwater Park alternatives were studied and circulated for public comment. The Golf Course Alternative would avoid impacts to Sweetwater Park but were considered to have substantial impacts to the Bonita–Sunnyside community. Specifically, the alignment would segment a "privately owned golf course (open to the public), the County Animal Shelter, and the Ulysses S. Jr. House, which is eligible for the *National Register of Historic Places* ... [and] is also subject to Section 4(f)." FHWA 28472. This particular Golf Course Alternative would also remove "up to 85 residences and five commercial units, including two horse ranches," and "would bisect a more densely populated area of the community, more residential units would be impacted by highway noise compared to the other western alignments studied." *Id.* This alternative would also have a greater impact on the community, be visible to a greater number of viewers, and lead to the possible closure of the golf course. *Id.* The closure of the golf course

could also result in "a severe loss of community open spaces" in the region.

The Section 4(f) evaluation also considered an alignment further west of the preferred route to avoid impacts on the Grant House and concluded that it "would cause even greater impacts to community character and cohesion by bisecting larger portions of the community and taking more homes and businesses." FHWA 28473. To avoid the Grant House, the alignment would be shifted approximately 800 feet further west and result in the displacement of at least 164 residences. The study explains that this alternative would require additional displacements because there "would not be adequate weaving distance to provide for efficient and safe traffic operations" at the interchange. *Id.* In order to ensure a safe alignment additional residents would be displaced.

Plaintiffs also contend that the "Conduit Road/Conduit Road West Alternative" ("CR/CRW Alternative") would take a smaller portion of the park (8.5% of Area 19 and 3.4% of Area 20 versus 40% and 25% for the preferred alternative). This proposed alignment was determined to have "extraordinary impacts to the community" because it passes closest to the most densely populated area of the community and "would discontinue the physical structure of a portion of the community, breaking its continuity as it now exists." FHWA 28481.

 In light of the Section 4(f) analysis the court concludes that the alternative alignments were not feasible and prudent because of (1) the extraordinary impacts to the community; (2) the extraordinary impacts to threatened and endangered species; and (3) the failure of the alternatives to accomplish the project objectives. Where the alternatives "do not accomplish the purposes of a project," they may be rejected as imprudent. *Arizona*

*Past and Future Foundation v. Lewis,* 722 F.2d 1423, 1428 (9th Cir.1983). Furthermore, although not discussed by the parties, the court also finds that the Secretary engaged in a detailed evaluation to minimize environmental harm to the Sweetwater Park. *See* 49 U.S.C. § 303(c). Appendix A to the Section 4(f) Evaluation details the efforts to mitigate the impacts on Sweetwater Park consistent the needs of the County of San Diego, Caltrans, and Sweetwater Authority. Those mitigation efforts include improvements or construction of recreational facilities and meeting rooms, noise reduction, replacement of various plant communities, visual improvements, and minimizing construction-related impacts. FHWA 28475–82.

In sum, while Plaintiffs identify some alternative that might have been considered or discussed more fully, the "detailed statement of alternative cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable." *Laguna Greenbelt,* 42 F.3d at 525 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). The record reflects that the FEIS contains an in-depth review of Section 4(f) resources, the project includes all possible planning to minimize harm, there is no prudent and feasible alternative to the preferred route, and that the decision is not arbitrary, capricious, or contrary to law.

*The Least Environmentally Damaging Alternative*

Plaintiffs argue that the Corps failed to develop the least environmentally damaging practicable alternative ("LEDPA"). Section 404 of the CWA authorizes the Corps to issue permits for the discharge of dredged or fill materials into waters of the Untied States. 33 U.S.C. § 1344(a)-(e). The regulations implementing Section 404 provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). This requirement is commonly known as the LEDPA. A "practicable alternative" is one that "is available and capable of being done after taking into consideration cost, exiting technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a).

Plaintiffs challenge a small portion of the project knows as the Conduit Road West ("CRW") alternative. Plaintiffs argue that the CRW, and not the Conduit Road East ("CRE") preferred route, is the LEDPA. During the course of EIS preparation, FHWA considered 30 project alternatives and variations, COE 06041, and 17 alignments were studied during the environmental review process. COE 05942. Of these, ten routing options were analyzed in greater detail, including the CRW and CRE alternatives. COE 05942; 5945–48; 06040–43. The Corps Record of Decision sets forth the following analysis explaining why the CRE routing was selected:

> [T]he Conduit Road East segment was identified as part of the Preferred Alternative because of the balance it strikes between impacts to sensitive biologic resources, the Bonita–Sunnyside community, and Sweetwater Regional Park. Because the Conduit Road East segment is located farther away from the community than the Conduit Road West segment, the Conduit Road East segment would have less noise and visual impacts to the community. The Conduit Road East segment would also require fewer residential and business displacements than the Conduit Road West segment

and would not impact the Bonita Gold (sic) Course, an important recreational and open space resource in the area. Although Conduit Road East would have greater impacts to sensitive biological resources, an appropriate mitigation package has been approved by the [USFWS] and [a] "No Jeopardy Finding" has been issued pursuant to Section 7 of the Endangered Species Act."

COE 6043. The Record of Decision also notes that all "resource agencies have acknowledged that no other alternative would result in less impacts to wetlands than the preferred alternative." COE 6044. The record reflects that the CRW would impact 2.96 acres of wetlands and the CRE 2.55 acres. COE 5943.

The court notes that the record, like many of the other issues raised by the parties, reflects the deliberative process at work. For example, Plaintiffs cite to the following commentary from the April 7, 2000 EPA letter:

> We also are concerned that the proposed alignment is not the LEDPA. EPA has determined that the Horseshoe Bend/Conduit Road West (HB/CRW) alignment is the least environmentally damaging practicable alternative. Although the impacts to wetlands/waters are comparable across the different alternatives, the HB/CRW has significantly fewer impacts to other natural resources including coastal sage scrub resources and gnat catcher habitat. In addition, the cost of the alternatives is comparable. In their April 4, 2000 letter to FHWA, the [FWS] stated that the preferred project would have greater environmental impacts and that 'Conduit Road West' (CRW) would have fewer impacts to wildlife resources than Conduit Road East (CRE), the preferred alternative.

COE 5040. Plaintiffs also cite to a April 26, 1999 e-mail authored by Terry Dean at the Corps who indicated that "the Corps concurred with the project proponents of the LEDPA. I understand Susan's tough situation, and really wanted to say that the Golf Course alignment [CRE] was the LEDPA, but management wouldn't back me up. Since the Service had accepted the mitigation for impacts within the park, the Corps' hands were tied. Wetland/waters impacts are similar on either site (gc/park), and our scope of analysis was limited to those areas and close proximity to them. We couldn't assume more jurisdiction or a wider scope of analysis." COE 5914.

The thrust of Plaintiffs' argument is that the contradictory comments and observations in the record demonstrate that the CRE is not the LEDPA. However, as set forth above and in numerous other documents in the record, COE 6039–43; 5941–45; 0054; 6006; 5734–35; 5548–5584; 5631–39, Defendants evaluated the environmental impacts of numerous different alignments and concluded that the CRE was the LEDPA. The seemingly contradictory observations of the EPA and Corps staff do not establish that the ultimate conclusion that the CRE is the LEDPA represents a clear error in judgment. For example, the meeting notes of November 6, 2002 reflect that in a meeting held on November 6, 2000 (after the date of the documents cited by Plaintiffs) the EPA "had concurred with Conduit Road East being the LEDPA." COE 5640.

The court observes that an effective deliberative process, by its very nature, requires the expression of open, frank and often contradictory opinions. The quality of agency decisions is enhanced through this deliberative process. *See Department of the Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). Here, the court concludes that the Corps adequately

balanced all of the impacts, and mitigation of those impacts, and reasonably concluded that the CRE alternative represented the LEDPA. The record does not support a finding that the agency's decision was arbitrary, capricious, or contrary to law.

## The Endangered Species Act

The Endangered Species Act of 1973 is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Communities of a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). To accomplish the goal of protecting endangered species, whenever a federal agency undertakes or permits activities that may affect a listed species, Section 7 of the ESA requires that the agency must, "in consultation with" FWS "insure" that those activities are "not likely to jeopardize the continued existence of" the species. 16 U.S.C. § 1536(a)(2). To meet this obligation, the federal agency prepares a Biological Assessment ("BA") that evaluates the impact of its activities on the species, 16 U.S.C. § 1536(c); 50 C.F.R. § 402.14, and FWS issues a Biological Opinion ("BiOp") detailing "how the agency action affects the species," and whether the action is "likely to jeopardize the continued existence of" the species. 16 U.S.C. §§ 1536(a)(2) and (b)(3)(A). This is known as the formal consultation.

■ The standard of review applied by a reviewing court to agency determinations under the ESA are governed by the arbitrary and capricious standard of review. *See Southwest Center for Biological Diversity v. U.S. Forest Service,* 100 F.3d 1443, 1448 (9th Cir.1996). Given the "high level of technical expertise" required to analyze the issues presented, the court "must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851 (quoting *Kleppe v. Sierra Club,* 427 U.S.

390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

Plaintiffs challenge the adequacy of the record with respect to (1) the Otay Mesa Mint, (2) the Quino Checkerspot Butterfly, and (3) the indirect and cumulative impacts to other listed species. Each is discussed in turn.

### The Otay Mesa Mint

■ The Otay Mesa Mint is a rare plant which occurs in a few vernal pool complexes underlain by Stockpen soils. The vernal pools at issue are located on Otay Mesa. FWS 9629. The February 1999 BiOp noted that "a single random event could result in complete extinction of" Otay Mesa Mint. FWS 5706. When two vernal pools containing Otay Mesa Mint were discovered within the footprint of the project, the alignment was shifted "to the west to avoid direct impact." FWS 5484. While SR 125 will not have any direct impact on the Otay Mesa Mint, the project will have indirect impacts. FWS 05489. The BiOp noted that "restoration and reintroduction are necessary to expand the current ranges of these (vernal pool species) endemic species to reduce risk of extinction through random and natural events." FWS 5706.

The FWS evaluated the alignment and acknowledged that SR 125 would divide the J29 and J30 vernal pool complexes and noted that these complexes have restoration potential. FWS 5695–575. As a part of the mitigation efforts, the roadway was narrowed and depressed in order to prevent surface disturbance to any of the vernal pools in J29 and J30. FWS 5684; FHWA 28174, 20984. Based upon the mitigation efforts, the FWS concluded that the indirect impacts to vernal pools had been minimized "to the maximum extent practical." FWS 05710.

The FHWA and FWS also took extensive steps to protect two other listed ver-

nal pool species, the spreading navarretia and the San Diego fairy shrimp. The integrated approach required Intervenors to purchase a 12 acre vernal pool habitat east of the SR 125 right-or way and a 40 acre Otay Mesa vernal pool area. FWS 5706, 5451, 5706. "Implementation of this restoration plan will result in twice the area of functioning vernal pools than was impacted." FWS 5706. The Otay Mesa Mint and three other plant species will be specifically re-introduced into restored vernal pool basins. FWS 5706, FHWA 28174. Based upon the extensive mitigation package, the FWS noted:

> The area of habitat to be restored is twice that to be impacted and should be of higher quality due to management and protection. In addition, it will create a larger block of vernal pool habitat when added to the Otay Ranch preserve and therefor should increase the long-term viability of the J29–30 vernal pool complexes.

FWS 5710. Accordingly the FWS and FHWA concluded that the long-term viability of the vernal pool complexes would have the "same or higher biological values." FWS 5706, FHWA 28174.

Plaintiffs argue that summary judgment is appropriate on this claim because the FHWA never requested formal consultation with respect to the Otay Mesa mint, that the draft BA admitted that SR 125 would impact the plant but the final BA reached the opposite conclusion, and that SR 125 will adversely impact the plant because it separates the J29 pool from the J 30 pool. These arguments are addressed in turn.

First, Plaintiffs contend that no formal consultation occurred because FHWA never formally requested such consultation. "Consequently, the FWS never made the required finding as to whether or not 125 South would jeopardize the species, and therefore FHWA illegally proceeded with 125 South without ensuring against jeopardy." Motion at p. 27:7–9. The record, as set forth above, demonstrates that FHWA did engage in extensive informal consultation with the FWS to avoid impacts to the Otay Mesa Mint. The consultations resulted in shifting the alignment of SR 125, narrowing the width of the road through the J29 and J30 areas, and depressing the highway at this location. The regulations specifically provide for informal consultation as an optional process. See 50 C.F.R. § 402.13(a). If the action agency makes modifications and determines that the action may still affect a specifies but is not likely to adversely affect, and the FWS concurs in writing, then consultation is concluded and formal consultation is not required. See 50 C.F.R. § 402.14(b)(1).

Here, the record amply demonstrates that FHWA and FWS did engage in extensive informal consultation which resulted in significant design modifications to SR 125 to avoid impacts to the Otay Mesa Mint. FWS 5384, 5684; FHWA 28174, 20984. As Plaintiffs point out, the 1999 BiOp refers to the San Diego Mint and not the Otay Mesa Mint and therefore the agencies could not have consulted on the Otay Mesa Mint. On December 10, 2002 Federal Defendants sought to correct the 1999 BiOp by submitting a letter indicating that the identification of the San Diego Mint, and not the Otay Mesa Mint, was a clerical error. (Defendants' Motion Exh. A). The court observes that Plaintiffs do not raise any evidentiary objections to the court considering the substance of the letter and the amended 1999 BiOp. Rather, Plaintiffs contend that Defendants are attempting to create a new record to justify its decision. Looking to the merits of Defendants' argument that the error was clerical in nature, the court observes that the context of the analysis provided by FWS and FHWA only makes sense if the reference is to the Otay Mesa Mint, and

not the San Diego Mint. FWS 5706. Accordingly, the court concludes that the FWS and FHWA engaged in informal consultations and that the FWS concurred in writing by issuing its 1999 BiOp.[8]

 Next, the court concludes that Plaintiffs cannot prevail on their argument that there is a debilitating inconsistency in the record because the draft BA indicated that the Otay Mesa Mint would be impacted, but the Final BA determined that it would not be impacted. The record reflects that SR 125 would not have a *direct* impact but that it would *indirectly* impact the Otay Mesa Mint. The alignment would not occupy any lands occupied by the Otay Mesa Mint. FWS 5684. However, the alignment would segment two vernal pool areas known as J29 and J30 and thereby cause an indirect impact on the Otay Mesa Mint. The inconsistency identified by Plaintiffs is more one of form, than substance and fails to establish that FHWA illegally proceeded with SR 125 without ensuring against jeopardy to a listed species.

 Finally, the FWS and FHWA took significant steps to develop a recovery plan for the Otay Mesa Mint. Not only was the SR 125 alignment modified to avoid vernal pools in the J29 and J30 areas but the footprint of the highway was reduced and the highway was located in a depression to prevent surface disturbances to the vernal pools. FWS 5484, 5684; FHWA 28174, 20984. Further, Intervenors were required to purchase a total of 52 acres to mitigate potential impacts and to reintroduce the Otay Mesa Mint into restored vernal pools. The recovery plan also calls for a five-year monitoring program to preserve and manage the resources.

In sum, the court concludes that the agency decisions were not arbitrary, capricious, or contrary to law.

*The Quino Checkerspot Butterfly*

 The Quino Checkerspot butterfly ("Quino"), once abundant in Southern California, is now listed as an endangered species. FWS 7010. The Quino inhabits grassland and ecotone areas between grasslands and coastal sage scrub, chaparral, and sparse native woodlands. FWS 5694. Two metapopulations are known to exist in the United States, one in San Diego County and the other in Riverside County. FWS 5693. In 1997 and again in 1998, biologists observed within the SR 125 alignment a single female Quino with "fresh wings," indicating that it had emerged onsite. This was one of six sites within San Diego County where the Quino has been observed. FWS 5694.

Plaintiffs contend that the BiOps failed to the use the best available science, that the BiOps failed to consider the indirect and cumulative impacts of SR 125 on the Quino, and that the FWS failed to consider the indirect and cumulative impacts to other listed species. Each argument is addressed in turn.

In support of the argument that Defendants did not use the best available science, Plaintiffs cite to a document prepared by a FWS biologist wherein he opined in an October 6, 1998 memorandum that

> Given the political realities of an impending solution that we may be displeased with, I have crafted a strategy that gives the 125 project the amount of certainty they desire to move forward with funding. Although my and Susan's ultimate solution was offered up a few weeks ago, it did not meet with approval from the 125 applicants. Therefore, its only under duress that this solution has come to fruition.

8. The court discusses the motion to strike in a following section of this order.

FWS 5097. Plaintiffs also refer to the 1999 BiOp which indicates that 49,000 square feet would be impacted. Plaintiffs do not explain how this single passage from the hundreds of pages of documents concerning the Quino renders the BA and BiOps inadequate because they failed to use the best available science.[9]

Upon review of the extensive record with respect to the Quino, the court concludes that the opinions expressed were considered and evaluated. FWS developed a mitigation plan to offset the effects of SR 125 on the Quino. The 2001 BiOp evaluated the status of the Quino and concluded that "the proposed management of existing populations, as well as the restoration of habitats on Otay Mesa is critical to the survival of the species." FWS 7407. In the opinion of FWS, the mitigation efforts would leave the Quino in a better position than at the time of the biological opinion because of these extensive mitigation efforts. FWS 5707, 5513–15, 5707, 5687. Based upon the record, the court concludes that the Secretary's conclusion that the SR 1245 project will not jeopardize the continued existence of the Quino, *see* 50 C.F.R. § 402.02, is neither arbitrary, capricious, nor contrary to law.

■■■■■ Next, Plaintiffs contend that the BiOps failed to consider the indirect and cumulative impacts on the Quino. Plaintiffs argue that the 1999 BiOp simply incorporated the MSCP and the 2001 BiOp, failed to "even mention the associated development or cumulative impacts to the species." (Motion at p. 29:16–17).

The record does not support Plaintiffs' expansive claims. The 1999 BiOp specifically refers to and incorporates the BA, the FWS Quino Checkerspot Butterfly Mitigation Strategy for State Route 125 dated November 17, 1998, and the MSCP. Such incorporation of other studies is not a violation of the ESA. *See Strahan v. Linnon,* 967 F.Supp. 581, 593 (D.Mass.1997). The BA noted indirect impacts due to human intrusion, construction, changes in surface and groundwater hydrology, and restoration of vernal pools. FWS 5489–5498. The mitigation section of the BA provides an extensive discussion of the steps to be taken to mitigate the indirect and cumulative impacts of SR 125 on the Quino. FWS 5512–29, 5687. While the portion of the BA discussing the direct and indirect impacts on the Quino is a generalized one, FWS 5489–98, the mitigation efforts discussed are extensive and demonstrate that the Secretary engaged in all possible planning to minimize harm to the Quino. In light of the studies and analyses considered by FWS, it concluded that "the mitigation program will ensure that the baseline status of the Quino is not lowered, and instead is increased." FWS 5707.[10]

■■■■■ Finally, Plaintiffs argue that the 1999 BiOp never analyzed the combined effects of the associated development and SR 125 on the federally listed California gnatcatcher, least Bell's vireo, San Diego fairy shrimp, Otay tarplant, and spreading navarettia. The primary difficulty with this argument is that the 1999 BiOp ad-

---

9. To the extent Plaintiffs argue that the Secretary may not consider or address political considerations, the Ninth Circuit has rejected such a bright-line rule. *See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 523 n. 5 (9th Cir. 1998) ("the Secretary must be permitted to choose the one [alternative] that best suits all of its interests, including political or business interests").

10. The court observes that the ESA definition of cumulative impacts is narrower than under the NEPA definition. The cumulative effects under the ESA are generally limited to future, non-federal actions, 40 C.F.R. § 1508.7, and therefore the 38 identified future projects in Southern San Diego County need not be considered a cumulative effect of SR 125.

dressed the indirect and cumulative effects in relation to the MSCP. The MSCP is a comprehensive conservation plan that protects and preserves threatened and endangered species. In order to achieve the purpose of preserving biodiversity, the City of San Diego, San Diego County, and several other local jurisdictions collaborated over a period of six years to develop a regional conservation plan that identifies and protects in perpetuity essential habitat for 85 threatened, endangered, and sensitive animal and plan species. FWS 0286–303. In addition to the conservation efforts identified in the MSCP; the 1999 BiOp analyzed a mitigation strategy for impacts to resources not anticipated in the MSCP. FWS 5534–37. The court observes that FWS also focused on the direct and indirect effects of the alignment on each of the five above identified species. The analysis identified the specific acreage of habitat and the number of each species to be affected. FWS 5699–5709. Significantly, the extensive mitigation efforts are designed to leave the identified threatened species in a better position than if the project is not constructed. For example the provisions include preservation of least Bell's vireo pairs at a 12:1 ratio for birds affected and restoration of affected wetlands, replacement of gnatcatcher localities, preservation of coastal sage scrub, preservation of spreading navarretia and the San Diego fairy shrimp. This later will be accomplished through the creation of the 12–acre vernal pool habitat. FWS 5685, 5688–5690.

Plaintiffs also contend that Defendants were required to consider the combined effects of future planned development in the region. However, the BA and the 1999 BiOp, in combination with the MSCP did consider the cumulative effects of the project. Each of the five identified species is a covered species under the MSCP. The record demonstrates that FWS analyzed the effects of SR 125, including the adopt-

ing of mitigation measures to "offset the impacts to these species." FWS 5710. Based upon this record, the court cannot conclude that the agency action was arbitrary, capricious, or contrary to law.

**Injunctive Relief**

Because the court finds that Plaintiffs cannot prevail on the merits, its motion to enjoin construction of SR 125 is denied.

**Conclusion**

For the above stated reasons, the Plaintiffs' motion for summary judgment is denied and the court grants summary judgment in favor of Defendants and Intervenors. The court also denies the motion for injunctive relief.

## OBJECTIONS TO THE DISCOVERY ORDER

This matter comes before the court on Plaintiffs' Objections to Magistrate Judge Porter's November 19, 2002 order granting in part and denying in part Plaintiffs' request for discovery ("Order"). Plaintiffs seek to conduct discovery regarding their allegations that Defendants acted in bad faith, improperly allowed Intervenors to prepare the EIS, and failed to adequately consider all relevant factors in reaching its conclusions. Intervenors and the Federal Defendants oppose Plaintiffs' Objections.

A party may object to a non-dispositive pretrial order of a U.S. Magistrate Judge within ten days after service of the order. Fed.R.Civ.P. 72(a). The magistrate judge's order will be upheld unless it is "clearly erroneous or contrary to law." *Id.;* 28 U.S.C. § 636(b)(1)(A). The "clearly erroneous" standard applies to the magistrate judge's factual determination and discretionary orders and will be overturned "only if the district court is left with the definite and firm conviction that a mistake has been made." *Weeks v. Sam-*

*sung Heavy Indus. Co., Ltd.,* 126 F.3d 926, 943 (7th Cir.1997).

Here, Magistrate Judge Porter thoroughly and thoughtfully analyzed Plaintiffs' request for discovery and articulated her reasons for denying discovery. Plaintiffs raise essentially the same arguments before this court as they did before Magistrate Judge Porter. Because Plaintiffs fail to raise any new arguments, the court incorporates the Order as if fully set forth herein. Moreover, the substance of Plaintiffs' arguments (bad faith, improper influence, and failure to consider all relevant factors) have been addressed in the present order. The arguments are not persuasive and fail to establish that discovery is warranted under the circumstances. Accordingly, the court denies Plaintiffs' Objections to the Order.

## THE MOTIONS TO STRIKE

### Plaintiffs' Motion

Plaintiffs move to strike the Federal Defendants' letter dated December 10, 2002 indicating that the 1999 BiOp contained a clerical error in that it erroneously identified the San Diego mint when it meant the Otay Mesa mint. Plaintiffs also move to strike a press release issued by the Department of Interior on October 23, 1997. Finally Plaintiffs object to Intervenors' Statement of Undisputed Facts on grounds that Intervenors mischaracterize the record.

■ First, the court denies the motion to strike the December 10, 2002 letter and the two amended pages to the 1999 BiOp. Plaintiffs move to strike this evidence on grounds that the letter and two amended pages are improper extra record evidence. This evidence is properly considered by the court. The evidence is not offered for the purpose of supplementing the record. Rather, the evidence is offered to correct a clerical error. The court has discretion to consider the corrections, especially where

Plaintiffs do not raise any evidentiary objections to consideration of this evidence.

■ With respect to the press release, the court grants the motion to strike because the press release is not part of the administrative record for this case nor was it relied upon by the Federal Defendants in their approval of SR 125. The motion to strike this document is granted.

Finally, with respect to Plaintiffs argument that Intervenors have mischaracterized the evidence, the court has considered the record, and not the characterization of the record. Accordingly, the motion to strike purported mischaracterizations of the record is denied.

### Defendants' Motions

■ Federal Defendants and Intervenors move to strike the declarations of Ellen T. Bauder, John Hammond, Vincent Scheidft, and Philip Unitt (Docket Nos. 99–103) on grounds that the declarations are improper extra-record materials. The court has reviewed the declarations and observes that they express legitimate concerns regarding the impact of SR 125 on the environment. Notwithstanding, as noted by the Supreme Court, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Friends of the Earth v. Hintz,* 800 F.2d 822, 829 (9th Cir.1986) (quoting *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). Accordingly, consideration of extra-record materials "to determine the correctness or wisdom of the agency's decision is not

permitted." *Asarco, Inc. v. U.S. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980).

Plaintiffs assert that the declarations were submitted for the purpose of demonstrating irreparable harm and the need for the injunction, thereby showing that Plaintiffs have standing to challenge agency action. However, there is no standing issue before the court because Plaintiffs acknowledge that standing is not disputed. (Opposition to Motion to Strike at p. 1:22). Next, Plaintiffs contend that the declarations are permissible under one of the narrow exceptions allowing discovery. *See Inland Empire Public Lands Council v. Glickman,* 88 F.3d 697, 703–04 (9th Cir. 1996). The court concludes that Plaintiffs fail to establish the threshold requirements to permit discovery. As set forth above, and in Magistrate Judge Porter's discovery order, Plaintiffs fail to show that Defendants acted in bad faith, the agencies failed to consider relevant factors, the agencies relied upon the declarations, or that the declarations explain technical terms. Accordingly, the court grants the motion to strike the extra-record declarations filed in support of Plaintiffs' motion for summary judgment.

In sum, the court denies Plaintiffs' motion for summary judgment, grants the Federal Defendants and Intervenors' motion for summary judgment, denies Plaintiffs' motion for injunctive relief, denies the objections to Magistrate Judge Porter's discovery order, grants in part and denies in part Plaintiffs' motion to strike, and grants Defendants' and Intervenors' motion to strike extra-record declarations filed by Plaintiffs.

**IT IS SO ORDERED.**